**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

|  |  |
|---|---|
| MICHELLA MARSHALL<br>1545 White Marsh Rd., Apt 8406<br>Kennesaw, GA  30152<br><br>PLAINTIFF,<br><br>v.<br><br>SHERRY DONAWORTH<br>Associate Professor of Clinical Nursing<br>University of Cincinnati.<br>222 Piedmont Ave<br>Cincinnati, OH 45219<br><br>KRISTA MADDOX<br>Senior Assistant Dean of Student Success<br>College Conduct Administrator<br>University of Cincinnati College of Nursing<br>222 Piedmont Ave<br>Cincinnati, OH 45219<br><br>AND<br><br>JOHN W. WEIDNER<br>Interim Executive Vice President for<br>Academic Affairs and Provost<br>University of Cincinnati<br>2618 University Circle<br>650 University Pavilion<br>PO Box 0097<br>Cincinnati, Ohio 45221<br><br>DEFENDANTS | Case No. 1:26-cv-00267<br><br>Judge:  Douglas R. Cole<br><br><br>COMPLAINT<br><br>AND<br><br>JURY DEMAND |

1

## INTRODUCTION

1. Plaintiff Michella Marshall[1] brings this action for violation of her First Amendment rights.

2. This case arises out of the efforts of UC to expel Marshall in retaliation for Marshall criticizing the school for the efforts to restrict DEI programs.

## PARTIES

3. Marshall is a former student at UC.

   a. Plaintiff is a Georgia resident with a residence at 1545 White Marsh Rd., Apt 8406, Kennesaw, GA  30152.

   b. Plaintiff has paid a significant amount of money to UC in the expectation of receiving an education and, if they successfully completes their classwork, a degree.

   c. The disclosure of Plaintiff's identity will cause the student irreparable harm as this case involves education records protected from disclosure by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g; 34 CFR Part 99.

4. Defendant Sherry Donaworth is an Associate Professor of Clinical Nursing at the University of Cincinnati.

   a. Donaworth has a principal place of business at 222 Piedmont Ave, Cincinnati, OH 45219.

   b. Donaworth is sued in her individual capacity for damages, only.

5. Defendant Krista Maddox is a Senior Assistant Dean of Student Success and College Conduct Administrator at the University of Cincinnati. at the University of Cincinnati.

   a. Maddox has a principal place of business at 222 Piedmont Ave, Cincinnati, OH 45219.

---

[1] Plaintiff originally brought this Complaint using the pseudonym "Marshall."

    b. Maddox is sued in her individual capacity for damages and in her official capacity for injunctive relief.  On information and belief, Maddox has the authority to provide all of the injunctive relief sought in this Complaint.

6. Defendant John W. Weidner is the Interim Executive Vice President for Academic Affairs and Provost for the University of Cincinnati.

    a. Weidner has a principal place of business at 2618 University Circle, 650 University Pavilion, Cincinnati, Ohio 45221-0097

    b. Weidner is sued in his official capacity for injunctive relief only.  On information and belief, Weidner has the authority to provide all of the injunctive relief sought in this Complaint.

    c. Weidner has responsibility for implementing the various policies and procedures UC has adopted related to student conduct and academic affairs.

## JURISDICTION AND VENUE

7. This case arises, in part, under the laws of the United States, specifically the free speech guarantees of the United States Constitution, and 42 U.S.C.S. § 1983.  Accordingly, this Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

8. This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391.  The defendant is a resident of the State in which this district is located and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTS

9. Prior to attending the University of Cincinnati, Marshall established a strong academic foundation at Cleveland State University, where she graduated *cum laude* with a Bachelor of Science in Nursing in May 2014, achieving a 3.48 GPA.  Marshall continued her studies at the same institution, receiving a Master of Science in Nursing in August 2016 with a cumulative GPA of 3.97.

10. Marshall's professional nursing career began in February 2015 as an Intermediate Care Unit (IMCU) Registered Nurse at University Hospitals in Cleveland. She subsequently broadened her clinical experience as a travel nurse for Aya Healthcare from April 2017 to April 2022, working in multiple states including Ohio, Pennsylvania, Georgia, Nevada, and Illinois. Transitioning into leadership and education, Marshall served as a Nursing Supervisor at University Hospitals from June 2022 through December 2024, where she provided operational support to patient care areas. She also held a position as a Clinical Instructor for LPN and RN programs at Hondros College of Nursing in early 2023 and worked as a Nurse Professional Development Specialist at the Cleveland Clinic from June 2023 to June 2025.  She holds a multistate Registered Nurse license in Ohio and is a Certified Medical-Surgical Registered Nurse (CMSRN).

### MARSHALL CRITICZES EFFORTS TO ROLL BACK DEI AT UC

11. Students, faculty, and staff have, over the past few years, voiced concerns about a lack of diversity, equity and inclusion within the College of Nursing.

12. A 2020 case study published an academic journal examined the impact of bias and discrimination within the nursing education environment. The article highlighted the need for systemic change to address, report, and mitigate these issues to create a more inclusive and equitable learning space for all students.  (Glazer G, Bankston K, Stacy K. *The University of Cincinnati College of Nursing Case Study: Bias and Discrimination in the Nursing Learning Environment*, Acad Med. 2020.)

13. Concerns about a lack of diversity, equity and inclusion within the College of Nursing and other programs at UC was raised at a meeting at the African American Cultural & Resource Center.  A forum was held on November 9, 2022 in response to an incident where a racist, hateful letter was sent to a Black faculty member at UC.

    a.  In the fall of 2022, the graduate student trustee for the UC Board of posted a letter on Instagram received by her academic advisor expressing vehemently racist and genocidal

views, sparking university-wide shock and condemnation.  The letter had repeated use of the N-word and other racial slurs, proclamations that "America must be ethnically cleansed" and comparisons of former First Lady Michelle Obama to "apes, chimpanzees, gorillas, orangutans."  A student newspaper article noted prior instances of discrimination at UC.  (Zurie Pope, *Racist letter sparks conversations about hate crimes at UC,* News Reporter Nov 4, 2022.)

b.  At the forum, the chair of diversity, equity and inclusion at the College of Nursing said, "we have work to do in addressing structural racism and bias."  A nursing instructor expressed the view that the College of Nursing "minimizes African Americans and lacks the appropriate culture of DEI."  This instructor said, "Racial discrimination and microaggressions are experienced by Black people in the College of Nursing, as elsewhere on campus."  The instructor specifically noted that African-American students may fear to speak out for fear of retaliation:

> this lack of whistleblowers is by design. "Speaking out requires courage because of potential ramifications," she said. "When the majority of white nurses do not believe racism is common in their profession, and Black nurses remain drastically underrepresented, racial disparities in health outcomes will be ongoing."

(Zurie Pope, *'Voiced concerns regarding equity': UC College of Nursing faces allegations over diversity,* News Reporter  Nov 17, 2022.)

c.  At a subsequent forum, the College of Nursing Dean apologized for racism students experienced in the past and promised to build a more equitable future.  (Zurie Pope, *College of Nursing Dean addresses racism in public forum,* News Reporter  Jan 18, 2023.)

14. In May, 2023, a change.org petition was created. The petition alleged that the "current, toxic culture around belonging, diversity, equity, and inclusion in the University of Cincinnati College of Nursing impacts the entire community of students, faculty, and staff."  The petition specifically

5

accused Maddox of retaliation against individuals who spoke out in favor of DEI initiatives at the College of Nursing:

> Krista Maddox, Senior Assistant Dean of Student Affairs
> 1.  Has called individuals who raise concerns about college culture "toxic, instigators, and agitators"
> 2. Previous staff members of color have reported "several months of silent treatment" after raising concerns about Black students' experiences
> 3.  Has repeatedly said that students in Cincinnati Public Schools are not prepared to succeed in the College of Nursing; has refused to recruit in Cincinnati Public Schools for the same reason
> 4.  Accused students of falsifying their stories of discrimination on social media.

(*Racially Just Leadership for the UC College of Nursing!*, https://c.org/Jfp4RzLHk9.)

15. In the summer of 2024, Marshall spoke to the DEI office via telephone to address financial hardships and the printing of course-related materials.

16. On February 14, 2025, the United States Department of Education published a "Dear Colleague Letter" explaining the new administration's positions with respect to diversity, equity, and inclusion ("DEI") principles and federal antidiscrimination law. A few weeks later, DOE issued an announcement that it would require states and school districts to affirmatively certify their compliance with DOE's interpretations of Title VI and *Students for Fair Admissions v. Harvard*, 600 U.S. 181 (2023).

    a.  The letter was the direct result on President Trump's January Executive Order 14173, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity."  The Executive Order suggested that DEI-related activities were unlawful and asserted that discussions about structural racism and related concepts risked creating a "hostile" and "discriminatory" environment.

    b.  The letter interpreted the Supreme Court's 2023 decision in Students for Fair Admissions v. Harvard—which originally only struck down affirmative action in admissions—to apply

to all aspects of campus life, including hiring, financial aid, housing, and graduation ceremonies.

17. While the letter caused immediate policy shifts at universities like the University of Cincinnati, multiple federal courts blocked its enforcement in April 2025. In *American Federation of Teachers v. U.S. Department of Education*, 1:25-cv-00628, (D. Maryland Aug 14, 2025), Judge Gallagher declared that DOE's action was not promulgated in accordance with the procedural requirements of the APA and ran "afoul of important constitutional rights."

18. The Trump Administration has withdrawn its appeal in *AFT* but may still pursue other strategies to restrict DEI programs. These include initiating civil rights investigations without a formal complaint (i.e., a directed investigation or compliance review), pressuring schools into broad compliance agreements, and using public advocacy to encourage challenges to race-specific initiatives.

19. As a result, of the Administration's yearlong campaign of civil rights enforcement and funding threats, schools like UC face uncertainty and confusion, leading many education institutions to overhaul or eliminate numerous diversity programs, including programs that arguably did not run afoul of Title VI nondiscrimination requirements.

20. In Ohio, Senate Bill 1, officially known as the Advance Ohio Higher Education Act, was a signed into law in March 2025 and took effect on June 27, 2025. SB1 effectively dismantled most traditional DEI structures at Ohio's 14 public universities and 23 community colleges. Universities were required to eliminate standalone DEI offices. SB1 Also contained protections for students expressing opinions on a "Controversial belief or policy," defined as "any belief or policy that is the subject of political controversy, including issues such as climate policies, electoral politics, foreign policy, diversity, equity, and inclusion programs, immigration policy, marriage, or abortion."

7

21. In February 2025 – prior to the passage of SB1 – UC announced it would begin dismantling its Diversity, Equity, and Inclusion (DEI) programs. This decision was primarily driven by the threat of losing federal funding following an executive order and the "Dear Colleague" letter from the Trump administration that effectively outlawed DEI practices at public universities.

    a. UC shuttered its central Equity & Inclusion Office.

    b. The university's four identity-based centers—the LGBTQ Center, the Women's Center, and Ethnic Programs & Services—ceased operations.

    c. The African American Cultural & Resource Center was renamed "The Cultural Center" and transitioned to a general-purpose facility for all students.

    d. UC began removing references to DEI principles from all university websites, social media, and collateral materials.

22. University President Neville Pinto stated that the institution had "little choice" but to comply, given its heavy reliance on federal funding. UC's DEI-offices, including the central equity and inclusion office and all four identity centers, were closed effective June 25 to comply with SB1. In announcing these changes, UC's President stated "I recognize that unwinding deeply rooted efforts around inclusion will undoubtedly challenge core feelings of belonging for many in our community. My message to you is unequivocal: You belong here. I encourage you to use the new facilities and programs to remain connected and find the support you need."[2]

23. Around the same time, Ohio enacted Senate Bill 104, commonly known as the "Bathroom Bill." SB104 prohibits state universities from "constructing, establishing, or maintaining" multi-occupancy facilities that are designated as gender-neutral or open to all genders. Any restroom,

---

[2] https://www.uc.edu/news/articles/2025/06/message-from-president-pinto--supporting-our-community-amid-change.html

8

locker room, or shower room designed for more than one person at a time must be designated for the exclusive use of either the "male biological sex" or "female biological sex."  The law defines sex based on the "biological indication of male and female... present at birth," regardless of a student's gender identity.

24. Marshall expressed significant opposition UC's changes to DEI programs and campus bathroom policies. She viewed these institutional changes as evidence that the university's values did not align with her own, and she explicitly linked these grievances to her defense during her academic misconduct proceedings.  For example:

    a.  On February 25, 2025, Marshall emailed her student success coordinator and academic advisor stating that she was "contemplating dropping out" or transferring to a university that "aligns with my values" due to UC's decision to roll back DEI programs to receive funding. One of the administrators responded that she "completely understand[s] and respect[s] your perspective on recent university decisions and actions.  Marshall responded, "Unless you have navigated life as a black woman, you could never 'understand' how I feel. Given this is 'nationwide,'  I am consulting with my love ones and contemplating dropping out the program completely. [sic]"

    b.  In the fall of 2025, Marshall complained to the Embedded Counselor for the College of Nursing about the use of language reinforcing Black stereotypes.

    c.  Marshall told staff that unless they had navigated life as a Black woman, they could not understand her feelings regarding these changes.

## MARSHALL'S EMAILS AND EXPULSION

25. In October, 2024, Dr. Amy Fathman had sent an email to Marshall regarding tone in emails about a "Group Case Study" and "Photo Quiz."  Dr. Fathman noted concerns about a "disrespectful and unprofessional tone" and Marshall's failure to respond to a meeting request.  She wrote "I had concerns that the communications were both highly inappropriate and highly unusual, and may reflect underlying personal or professional issues that could benefit from discussion and possibly support services."  No disciplinary or other action followed this exchange.

26. On November 6, 2025, Marshall emailed instructor Ashley Carrasquillo inquiring about ungraded assignments.  After receiving no response to her initial  email, Marshall sent a follow-up a message via Canvas, a school classroom and messaging application, to Carrasquillo.

27. On November 8, 2025 Marshall complained again about delays in grading assignments.  She wrote, "We have a week to complete assignments but instructors have two weeks to grade? Make it make sense. This is just a money grab class."

    a. On November 11, 2025, in response to a  request to resubmit a certificate, Marshall posted a comment in the submission box: "Girl just grade my assignment."

    b. On November 12, 2025 Carrasquillo responded, "I apologize for the delay in the most recent grades as there were extenuating circumstances."  She added, "Personally, I find the tone of your email concerning and unprofessional and have copied Donaworth on this reply."

    c. On November 13, 2025, Donaworth responded to Jean Depont's email.  Donaworth wrote that "Being a NP is a privilege that assumes both ethical and professional obligations."  Donaworth also wrote, "It's entirely reasonable and appropriate to email a professor regarding a missing grade, as assignments can certainly be overlooked. However,

10

I find the tone of your email disrespectful and unprofessional. It's also worrisome to me that you may communicate with preceptors in a similar manner."

d. On November 14, 2025, Marshall responded, "Just focus on my grading my assignments. I do not care for your opinion."  Donaworth wrote back, "Your response to my email is disrespectful and unacceptable. We need to schedule a phone call to discuss these issues."

e. On November 15, 2025, Marshall responded, "I am not obligated to speak to you. The time it took to draft these emails, my assignment could've been graded."  A few days later, she wrote, "I'm not meeting with you."

28. On November 19, 2025, Donaworth started the process for discipline for academic misconduct. Krista was the College Conduct Administrator assigned to the matter.

29. On November 21, 2025 Marshall complained that her language was not offensive in "my culture" and that the professors' "lack of understanding of the word highlights bigger issues with understanding cultural differences and quite frankly is discriminatory."  Marshall further complained that the professors' actions were "discriminatory and retaliatory in nature."  She explained:

> [Dr. Donahue] also stated in an email that being an NP is a privilege, upon graduation students represent the university all over the country, and this responsibility is taken seriously.
>
> The university eliminated their DEI programs and renamed the African American Cultural and Resource Center (AACRC) to the Cultural Center. As a black woman who faces discrimination every day, and has advocated for patients of color, why would I care about representing a university that does that care to represent me?

30. On November 18, 2025, Donaworth sent Marshall a Notification Form regarding Academic Misconduct.  The form cites "Violating Professional Standards/Codes" and accused Marshall of "Unprofessional, disrespectful and abusive email communications with faculty on multiple occasions. Incongruent with the both the ANA Code of Ethics for Nurses (Prov. #6) and the Student Code of Conduct."

11

31. On November 19, Marshall replies to the notification email declining to meet with Donaworth.

32. On November 21, 2025, Donaworth sent Marshall a "Resolution Form," indicating that even if Marshall accepted responsibility for misconduct, the recommended penalty would be expulsion.

33. On November 21, 2025, Marshall submitted a complaint to UC Office of Equal Opportunity (OEO). The complaint noted that "The university eliminated their DEI programs and renamed The African American Cultural and Resource Center (AACRC) to the Cultural Center" and that the disciplinary proceedings against her were "discriminatory and retaliatory." The complaint was ultimately dismissed.

34. On December 6, 2025, Marshall emailed Maddox and Donaworth expressing same suicidal thoughts. She wrote, "I do not accept responsibility of the alleged allegation. Yet, I have no more fight left in me personally or professionally… I no longer want to continue in the program."

35. On December 8, 2025, Donaworth replied to Marshall providing mental health resources and stating, "If you do decide to withdraw from the University, I wish you all the best..."

36. On December 10, 2025, Marshall informed Maddox that she had retained an attorney. Maddox responded that if Marshall brings an attorney, a UC attorney must also be present.

37. On December 11, 2025, Marshall requested the hearing be rescheduled to allow her attorney to attend. Maddox denied the request. Marshall sent an email stating she feels targeted and will not bring her advisor since the hearing was not rescheduled. She wrote, "I find your email to be aggressive and I'm beginning to feel targeted and harassed… my advisor will not be present."

38. On December 12, 2025, the Hearing Panel convened via Zoom. Maddox was responsible for the operation of the Panel and insuring that it complied with applicable rules.

    a. Donaworth testified that Marshall's email were "not appropriate behavior… it was indeed okay to email faculty regarding a missing grade, that sometimes oversights can happen, but that that was not the appropriate language to use."

12

b. Donaworth also told the panel about allegations that "There were incidents of the student having similar disrespectful language and the refusal to meet with faculty" at other times, but did not provide any specific evidence.

c. Marshall told that hearing panel that her email was sent according to instructions in the course syllabus. She characterized her emails as "blunt" but not inappropriate.

d. Marshall indicted her belief that the phrase "being a NP is a privilege" and that the students would "represent the University of Cincinnati across the country" was offensive to her "given the context of the country is now…" She said:

> So I took that as an offence also, as far as the University of Cincinnati, representing that across the country, as the elimination of DEI and initial biological men and women signs in the bathroom that were since taken out. I have a transgender niece. So that I took offense to that."

e. Marshall explained that she has been working as a nurse for 11 years and "I've never had any complaints in regards to my professionalism with anything." She added:

> I've seen how important it is for clinicians to reflect the communities they serve and how it enhanced the quality of care provided. Just speaking to the language that I use is just cultural differences… So sometimes it comes off the blunt and may be perceived as something different, but that's not my intent."

39. On December 12, 2025 Marshall received an email indicating that she had been found responsible and would be expelled. Marshall appealed the decision.

40. On January 21, 2026, Provost John W. Weidner sent the final decision letter regarding the appeal.

41. The expulsion from UC has resulted in damage to Marshall's academic and professional reputations and will affect her ability to find professional employment. Marshall also suffered humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other non-economic damages.

13

**COUNT I**
**RETALIATION IN VIOLATION OF FIRST AMENDMENT**
**(42 U.S.C. § 1983)**

42. Plaintiff repeats and incorporates all of the allegations of this Complaint, as if fully set forth herein.

43. This Count is brought against Defendant Weidner in his official capacity for declaratory and injunctive relief.

44. This Count is brought against Defendant Maddox in her individual capacity for damages in her official capacity for declaratory and injunctive relief.

45. This Count is brought against Defendant Donaworth in her individual capacity for damages.

46. Defendants, while acting under color of state law, deprived Marshall of a right secured by the Federal Constitution or laws of the United States.

47. Defendants retaliated against Marshall in violation of her rights under the First Amendment to the United States Constitution.

48. Marshall's complaints about UC's efforts to restrict DEI programs and access to restrooms for transgender students were protected expressions under the First Amendment.

49. The proffered reason for Marshall's dismissal was pretextual in that it was insufficient to merit dismissal under these circumstances.

50. Donaworth's actions were motivated at least in part by the Marshall's protected conduct:

    a. Dr. Donaworth brought student misconduct charges against Marshall in retaliation for Marshall's complaints about the elimination of DEI programs and cultural differences.

    b. This motivation is shown, in part by the fact that Donaworth sought an excessive penalty – expulsion --- for what appears to be minor violations of the Student Code of Conduct.

51. Maddox's actions were motivated at least in part by the Marshall's protected conduct:

    a. Maddox pursued the student misconduct charges against Marshall in retaliation for Marshall's complaints about the elimination of DEI programs and cultural differences.

14

b. This motivation is shown, in part by the fact that Maddox approved of the excessive penalty – expulsion --- for what appears to be minor violations of the Student Code of Conduct.

c. This motivation is shown, additionally, by the prior statements of Maddox critical of students who were advocating for UC to continue or expand DEI initiatives.

52. Pursuant to 42 U.S.C. §1983, Marshall is entitled to her damages incurred in bringing this action, including punitive damages.

53. Pursuant to 42 U.S.C. §1988, Marshall is entitled to her attorney's fees incurred in bringing this action.

*Wherefore*, Plaintiff seeks the following relief from the Court:

- Judgment in favor of Marshall on all counts, including a declaration that the discipline imposed on Marshall is invalid under the United States Constitution
- A Permanent Injunction vacating any disciplinary findings,  compelling Defendants to remove any negative notation from Marshall's  disciplinary records, and prohibiting further disciplinary proceedings in a manner that violates the United States Constitution.
- Judgment in favor of Marshall awarding damages in an amount to be determined at trial;
- Punitive damages to the extent available under law
- Court costs and other reasonable expenses incurred in maintaining this action, including reasonable attorney's fees as authorized by 42 U.S.C. §1988.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

Respectfully submitted,

     /s/ Joshua A. Engel
Joshua Adam Engel (0075769)
ENGEL AND MARTIN, LLC
4660 Duke Dr., Suite 101
Mason, OH 45040
(513) 445-9600
engel@engelandmartin.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been electronically served via the Court's electronic filing system this June 11, 2026 upon all counsel of record.

/s/ Joshua Engel
Joshua Engel